IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DARRIAN DANIELS,

      Plaintiff,

v.                                                    Case No. 23-cv-2061-NJR

QUINN BAKER, TYSON CHOATE,
JAKOB UPTON, KEN MODGLIN, and
ANTHONY WILLS,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Darrian Daniels, an inmate of the Illinois Department of Corrections who is currently incarcerated at Menard Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. This matter is currently before the Court on Defendants' motion for summary judgment on the issue of exhaustion of administrative remedies (Docs. 89, 90). Daniels filed a response (Doc. 96) in opposition to the motion, Defendants filed a reply (Doc. 99). On July 16, 2024, the Court held a hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008).

### BACKGROUND

On June 15, 2023, Daniels initiated this lawsuit by filing a motion for preliminary injunction regarding his placement in a suicide watch cell (Doc. 1). Daniels filed his formal Complaint the next week (Doc. 4), alleging deliberate indifference to his

conditions of confinement. After review of the Complaint pursuant to 28 U.S.C. § 1915A, Daniels was allowed to proceed on the following count:

> Count 1:    Eighth Amendment deliberate indifference claim against Quinn Baker, Tyson Choate, Jakob Upton, Ken Modglin, and Anthony Wills for denying Daniels access to food trays, placing him in a suicide cell without water and a working toilet, and denying him access to yard and showers.

(Doc. 6, p. 5).

The Complaint alleged that Daniels was placed in a condemned suicide watch cell after refusing to take a TB (tuberculosis) shot (Doc. 6, p. 2). Daniels refused the shot because he previously had an allergic reaction to the shot (*Id.*). Because he refused the shot, he was placed in a cell in North 2 Restrictive Housing Unit. Daniels alleges the cell lacked running water and a working toilet (*Id.*). The light in his cell remained on 24/7 (*Id.*). He was denied access to his property and denied access to lunch and dinner trays on numerous occasions. Daniels also received empty trays on several occasions (*Id.* at p. 3). He was also denied access to the yard and showers (*Id.*).

## A. Motion for Summary Judgment

Defendants contend that Daniels failed to file any grievances regarding the conditions he experienced in the suicide watch cell. Travis Bayler, the current chairperson of the Administrative Review Board ("ARB"), attested in an affidavit that there are no grievances on file from Daniels pertaining to his placement in a suicide watch cell (Doc. 90-1, p. 4). Anthony Wills, the warden at Menard, attested in an affidavit that he did not receive any grievances from Daniels during the relevant time-period (Doc. 90-2). Wills acknowledged speaking with Daniels about his placement in restrictive housing on

April 14, 2023. Although he verbally complained about being placed in restrictive housing because of his refusal to take a TB test, Daniels did not make any other complaints (*Id*.).

In response, however, Daniels asserts that he submitted two emergency grievances regarding the condition of his cell. Specifically, he contends that he submitted an emergency grievance on March 26, 2023, and a second emergency grievance three days later (Doc. 96, p. 1-2).

Handwritten grievances submitted on notebook paper are attached to Daniels's Complaint (Doc. 4, pp. 15-17). A handwritten submission purporting to be Daniels's March 26 grievance states that he was issued a disciplinary ticket for refusing to take a TB test (*Id*. at p. 15). His note further states that the "shift review officer" ordered staff to place him in a condemned suicide watch cell without his property (*Id*.). He described the conditions of the cell and stated that "Nurse Reva" was harassing him for his refusal to take a TB test (*Id*.). A handwritten note purporting to be Daniels's March 29 grievance states that guards Choate, Baker, Lightfoot, Upton, and a John Doe officer violated Daniels's rights by refusing him food trays (*Id*. at p. 16).

Daniels argues that after he submitted the two grievances in March 2023, the officer in charge of bringing the grievance box through the unit to collect grievances refused to take any additional grievances from him (Doc. 96, p. 2). In addition to complaining to Wills verbally on April 14, 2023, Daniels contends that he spoke to Wills on at least two other occasions between April 1 and April 14, 2023 (*Id*. at pp. 2-3). He complained about the conditions of his cell and the denial of food trays by certain officers

3

(*Id*. at p. 3). Daniels argues that on one occasion, Wills responded that "you [know] I always forget to respond to your grievance[s]" (Doc. 4, p. 4). He argues that he never received a response to the grievances and submitted his Complaint after the deadline for receiving a response had passed.

### B. *Pavey* Hearing

On July 16, 2024, the Court held an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). The Court heard testimony from Joleen Klump, Plaintiff Daniels, and Sara Quick.

#### 1. *Joleen Klump*

The Court first heard testimony from assistant ADA coordinator Joleen Klump. Prior to the evidentiary hearing, Daniels filed a motion for communications assistance (Doc. 121) alleging that his hearing aids were recently confiscated, he failed a subsequent hearing test, and he was waiting for new hearing aids. Daniels contended that he would need assistance in order to participate in the evidentiary hearing because he could not hear (*Id*. at p. 2).

At the evidentiary hearing, Klump testified that Daniels submitted his previous hearing aids for repair. But upon inspection of the hearing aids, staff determined they were registered to another inmate. In fact, the hearing aids had been listed as stolen. Because the hearing aids did not belong to Daniels, they were confiscated. In response, Daniels requested hearing aids of his own and was scheduled for a hearing test. On June 22, 2024, Daniels failed the hearing test and was referred to an audiologist. Klump testified that the audiologist holds clinics at the prison every other month, but she is

4

currently working to schedule monthly clinics due to the backlog of inmates needing appointments. Klump noted that the current wait to see an audiologist is one year.

Although Daniels indicated that he could not hear the Court through the video equipment, Daniels was provided with a real-time transcript of the proceedings. He acknowledged that he was able to follow along and was willing to participate in the hearing. He did not demonstrate any difficulties in reading the proceedings and responding in an appropriate fashion. Thus, the Court proceeded with the evidentiary hearing despite Daniels's hearing difficulties.

### 2. *Darrian Daniels*

Daniels next testified about his attempts to exhaust his grievances. He testified that the two grievances on notebook paper that he sent to the Court were copies of the grievances Daniels allegedly wrote while housed in the suicide watch cell in restrictive housing. Daniels testified that he is not allowed to make copies of grievances in the law library and thus he only had handwritten copies. He submitted the actual grievances on grievance forms. After completing the grievances, an assistant gallery officer came through the cellhouse with a grievance box, and Daniels slid the grievance in the box. He submitted the second grievance three days later. He never received a response to the either grievance.

On cross-examination, Daniels testified that his first grievance was submitted on a grievance form. He then copied it on notebook paper. Daniels testified that he waited until he received another grievance form to write and submit his second grievance. He did not have any other grievance forms to write copies of the grievances, so he copied the

grievances on notebook paper. He testified that he was not able to speak to a counselor while in the suicide watch cell because counselors do not make rounds in that cellhouse. Daniels noted that inmates on the gallery are naked due to the cells being suicide watch cells, and counselors do not come into the suicide watch area of the cellhouse.

After submitting the two grievances, Daniels testified that he was not allowed to submit additional grievances. The correctional officers refused to bring the grievance box to his cell. He spoke to Warden Wills on two occasions about his grievances, the conditions he was experiencing in his cell, and his access to food trays. He told Warden Wills that staff members were denying him access to the grievance process. Daniels also testified that at some point, Wills indicated that he would not respond to any of Daniels's grievances. Daniels stated that he is currently in segregation, and guards refuse to allow him to submit grievances there as well.

### 3. *Sara Quick*

Sara Quick testified about her job as a counselor at Menard. Although she is currently temporarily assigned as a casework supervisor, during the relevant time period for this case, she was a counselor. Quick testified that grievance forms are in the cellhouses, and she can also direct that an inmate be provided with a grievance form if requested by the inmate. She further testified that inmates are allowed additional grievance forms in case they want to make handwritten copies of grievances they submit. She could also check on the status of a grievance if requested by the inmate.

Quick testified that during the time that Daniels was in the suicide watch cell, she made rounds through the cellhouse. Specifically, she made tours of the cellhouse every

week. She would have been able to talk to Daniels, and he could have inquired about the status of a grievance at any time. Despite Daniels's insistence that counselors do not make rounds through the suicide watch cells, Quick testified that counselors do talk to inmates on suicide watch and that she specifically spoke to Daniels while he was in the suicide watch cell.

According to her notes in Daniels's cumulative counselor summary, Quick saw Daniels on her tour several times during March, April, and May 2023 (*See also* Doc. 126-2).[1] Notes from March 29 indicate that Quick spoke with Daniels on that day (*Id.*). Daniels inquired as to whether he was under investigation, and Quick noted that he had a disciplinary report with a hearing set for March 30 (*Id.*). The notes also indicate that Quick saw Daniels on April 5, April 12, April 19, April 26, May 3, May 10, May 17, May 24, and June 7, 2023 (*Id.*). The entries merely indicate that Quick saw Daniels but do not indicate any particular discussion between the two (*Id.*).

At the evidentiary hearing, Quick reiterated that she is allowed to see inmates on suicide watch and speak with them during her tours of the unit. Quick testified that inmates on suicide watch ask for copies of trust fund statements and request the status of grievances previously submitted. She speaks with them face-to-face at the cell front and then documents those conversations after she leaves the gallery. If Daniels had made complaints about his presence in the suicide watch cell, the conditions of his cell, or issues

---

[1] At the end of the hearing, the Court directed Defendants to submit documents referred to during the hearing, including the cumulative counseling summary. The Court also granted the parties leave to file supplemental briefs.

with his grievances, Quick testified that she would have documented those complaints in her notes.

Daniels questioned whether Quick really visited inmates on suicide watch, and Quick was adamant that she speaks to all inmates on the unit, both those on suicide watch and in restrictive housing. Daniels stated that Quick was not the counselor on 5 Gallery where he was held but was instead assigned to either 2 or 4 Gallery. He also indicated that he had a copy of the cumulative counseling summary that would confirm that she was not the counselor for 5 Gallery.

### C. Relevant Findings

At the hearing, counsel for Defendants asked the Court to take judicial notice of credibility findings made by Magistrate Judge Mark A. Beatty in another of Daniels's cases. In *Daniels v. Schoenbeck, et al.*, Case No. 21-cv-00529-MAB (Doc. 97) (Sept. 8, 2022), the defendants also sought summary judgment for Daniels's alleged failure to exhaust his administrative remedies prior to filing his lawsuit. At the evidentiary hearing, Daniels testified that he attempted to submit grievances relevant to his claims, but the grievances were deemed non-emergencies and returned to him (Doc. 97, pp. 6-7). After the return of his grievances, he attempted to resubmit the grievances to the grievance officer, but the grievances were returned with instructions to submit the grievances directly to the ARB (*Id.*). Daniels allegedly did as he was instructed, but the ARB never returned the grievances (*Id.*).

In granting the defendants' motion for summary judgment, Magistrate Judge Beatty found Daniels's testimony lacking in credibility (*Id.* at p. 14). Daniels testified that

he understood the grievance process and the process does not allow for the direct appeal of a warden's determination that a grievance is a non-emergency. Further, the warden responded to Daniels's grievances with instructions to submit them in the normal manner (*Id.*). Judge Beatty found that Daniels's testimony lacked "any of the standard indicia of credibility" because it was short of details about the counselors and officers that he spoke to about his grievances, and there was no evidence to corroborate his story (*Id.* at pp. 14-15). Judge Beatty further found Daniels's testimony about his attempts to submit additional grievances neither "plausible on its face" nor was there evidence in the record supporting his story (*Id.* at p. 16). Judge Beatty ultimately concluded that Daniels failed to exhaust his administrative remedies and granted summary judgment in favor of the defendants (*Id.* at p. 18).

In addition to Magistrate Judge Beatty finding Daniels's testimony lacking in credibility, in another of Daniels's cases, he was recently sanctioned for his attempts to perpetrate a fraud on the court. Specifically, in *Daniels v. Brown, et al.*, Case No. 21-cv-00890-DWD (Doc. 145) (Aug. 12, 2024), District Judge David W. Dugan found that Daniels forged a shakedown slip in order to implicate two of the defendants in the case (Doc. 145, p. 3). In that case, the defendants presented substantial evidence indicating that Daniels had forged the document. One of the defendants who reportedly conducted the shakedown and signed the slip was not even working on the relevant date, and the other defendant was not assigned to Daniels's gallery (*Id.* at p. 5). The time of the shakedown also appeared to be forged as the time listed was not a time when shakedowns were normally conducted (*Id.* at p. 6). Further the slip was not consistent with the way

correctional officers would document a slip and contained several anomalies indicating fraud (*Id*. at pp. 6-8). Judge Dugan found that the slip, submitted by Daniels in response to a summary judgment motion, was clearly fraudulent and that Daniels perjured himself by continuing to insist the document was genuine at the evidentiary hearing (*Id*. at p. 10). Because of Daniels's misconduct, Judge Dugan dismissed Daniels's case with prejudice as a sanction for the fraud (*Id*. at pp. 10-11).

### D. Subsequent Briefing

The Court granted the parties two weeks to submit supplemental briefing after the hearing. On July 25, 2024, Daniels submitted a "very important notice" alleging that on July 17, 2024, he submitted his supplement to the Court (Doc. 124). Daniels alleged the supplement included a page from the inmate handbook showing that Sara Quick was assigned the counselor for 4 Gallery in North 2 Restrictive Housing at the time that Daniels was housed in segregation (*Id*. at pp. 2-3). Daniels had previously testified that he was housed on 5 Gallery. Daniels also maintained that he sent his entire cumulative counseling summary that proved he only had contact with Quick when she was a counselor on 4 Gallery in 2018 and 2019 (*Id*. at p. 3).

Although Daniels maintained that he submitted this supplement on July 17, 2024, the Court never received the document. Daniels alleged in his "very important notice" that the defendants stole his mail, noting that submissions in his other cases also went missing (*Id*. at pp. 1-2). Daniels argued that if the Court did not ultimately receive his supplement, then it was clearly stolen. He also referred the Court to his other pending cases, *Daniels v. Brown*, Case No. 21-cv-00890-DWD, and *Daniels v. Wills*, Case No. 24-cv-

1397-DWD, noting that he had demonstrated retaliation by the defendants in those cases (*Id*. at p. 3).

On July 30, 2024, the Court entered an Order acknowledging Daniels's notice and informed Daniels that his supplement was not received by the Court (Doc. 125). But the Court found no evidence that the defendants interfered with Daniels's legal filings (*Id*.). Instead, the Court received documents from Daniels in two of his other pending cases, but neither of the submissions contained the documents Daniels allegedly submitted to the Court. Although there was no evidence of tampering by the defendants, Daniels was granted additional time to re-submit his supplement.

On August 9, 2024, the Court received a Second Supplement to the Record from Daniels (Doc. 127). Daniels argued that Warden Wills has a history of directing staff to falsify affidavits, pointing to a previous notice filed by Daniels arguing that a declaration from Connie Dolce was falsified (Doc. 83, p. 1). Daniels stated that he could not disprove Quick's testimony that she was the 5 Gallery counselor and spoke to inmates on suicide watch, but he argued that he could prove that he was denied the grievance process (Doc. 127, p. 2). Daniels argued that it was common sense that officials, including Warden Wills, who had improperly housed Daniels in a suicide cell and sought to starve him, would not allow him to exhaust grievances about their alleged misconduct (*Id*.). Daniels argued that he could not do anything if he was denied the chance to submit a grievance or if the grievance was ignored by staff (*Id*. at p. 3). Thus, he argued, the grievance process was unavailable to him.

Defendants also filed a supplement to their motion for summary judgment (Doc. 126). They offered as an exhibit the cumulative counseling summary referred to by Sara Quick in her testimony (Doc. 126-2). They also offered an affidavit from grievance officer Kelly Pierce. She attested that no grievances were submitted by Daniels during the relevant time period from March 2023 through August 2023 (Doc. 126-1).

## Legal Standards

Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [Defendants are] entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. §1997e(a). That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* (emphasis added). The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (noting that "[t]his circuit has taken a strict compliance approach to exhaustion"). Exhaustion must occur before the suit is filed. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). A plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending. *Id.* Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2005). Consequently, if a prisoner fails to properly utilize a

prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809.

Exhaustion is an affirmative defense, which the defendants bear the burden of proving. *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). But the Seventh Circuit has held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge. *Pavey v. Conley*, 544 F.3d 739, 740-41(7th Cir. 2008). Thus, when failure to exhaust administrative remedies is raised as an affirmative defense, the Seventh Circuit set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3) If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Id*. at 742.

13

## A. Illinois Exhaustion Requirements

As an IDOC inmate, Daniels was required to follow the regulations contained in IDOC's Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his claims. 20 Ill. Administrative Code §504.800 *et seq*. The grievance procedures first require inmates to file their grievance with the counselor within 60 days of the discovery of an incident. 20 Ill. Admin. Code §504.810(a). The grievance form must:

> contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 Ill. Admin. Code §504.810(c). Grievances that are unable to be resolved through routine channels are then sent to the grievance officer. 20 Ill. Admin. Code §504.820(a). The Grievance Officer will review the grievance and provide a written response to the inmate. 20 Ill. Admin. Code §504.830(a). "The Grievance Officer shall consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer ["CAO"] within two months after receipt of the grievance, when reasonably feasible under the circumstances." 20 Ill. Admin. Code §504.830(e). "The Chief Administrative Officer shall review the findings and recommendation and advise the offender of his or her decision in writing." *Id.*

If the inmate is not satisfied with the CAO's response, he or she can file an appeal with the Director through the ARB. The grievance procedures specifically state, "[i]f, after receiving the response of the Chief Administrative Officer, the offender still believes that

the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director. The appeal must be received by the Administrative Review Board within 30 days after the date of the decision." 20 Ill. Admin. Code §504.850(a). The inmate shall attach copies of the Grievance Officer's report and the CAO's decision to his appeal. *Id.* "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations." 20 Ill. Admin. Code §504.850(d). "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." 20 Ill. Admin. Code §504.850(e).

The grievance procedures allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the CAO who may "[determine] that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis. 20 Ill. Admin. Code §504.840(a). If the CAO determines the grievance should be handled on an emergency basis, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him what action shall be taken. 20 Ill. Admin. Code §504.840(b). If the CAO determines the grievances "should not be handled on an emergency basis, the offender shall be notified in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process." 20 Ill. Admin. Code §504.840(c). When an inmate

appeals a grievance deemed by the CAO to be an emergency, "the Administrative Review Board shall expedite processing of the grievance." 20 Ill. Admin. Code §504.850(f).

ANALYSIS

Defendants argue that Daniels did not file any grievances relevant to his claims in this case. Daniels contends that he was thwarted in his attempts to exhaust his administrative remedies.

Daniels asserts that he was thwarted in attempting to exhaust his claims because officials never returned the two grievances he submitted and stopped accepting additional grievances. *See Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008) (an inmate is not required to appeal his grievance if he submits the grievance to the proper authorities but never receives a response). But the Court does not find Daniels's testimony regarding his grievances to be credible. Daniels testified that he submitted two grievances, on grievance forms, to the grievance box three days apart. He submitted what he alleged were handwritten copies on notebook paper with his pleadings. The first grievance, dated March 26, 2023, complains about the conduct of Nurse Reva—who is not a party to this case (Doc. 7, p. 15). The second grievance does complain about Daniels's placement in segregation and the withholding of his food trays (*Id*. at p. 16-17). There is simply no evidence, however, that either of these grievances were submitted as Daniels testified. Daniels testified that he submitted the grievances to the grievance box, but there is no record of the grievances being received by any grievance official. The grievances are housed in a *locked* grievance box which are then sent to the grievance officer, counselor, or the CAO, depending on the nature of the grievance (Doc. 126-1,

16

pp. 1, 3). But Daniels's grievance, marked as an emergency, was not received by warden Anthony Wills, nor was it received by the grievance officer or counselor (Docs. 90-2, 126-1). Wills specifically stated in his affidavit that he did recall speaking to Daniels about his placement in restrictive housing, but he never received a written grievance from Daniels about the conditions of his confinement (Doc. 90-2, p. 1).

Further, Daniels's testimony was refuted by other testimony and evidence in the record. Daniels testified that he submitted copies of his grievances on notebook paper because the law library does not copy grievances and he is not able to obtain multiple grievance forms in order to make copies. But Sara Quick, who was a counselor at the time Daniels allegedly submitted his grievances, testified that inmates are allowed additional copies of grievance forms for the specific purpose of making handwritten copies for themselves. Quick also refuted Daniels's testimony that he never spoke to a counselor while in the suicide watch cell and that counselors do not make rounds in that area of the prison. Quick testified that she did make rounds in segregation as well as the suicide watch cells. Despite Daniels's contention that counselors would not speak with mentally unstable inmates who were naked and often covered in feces, Quick testified that she spoke to those inmates on suicide watch on a regular basis. Although the inmates do not have access to pens, Quick testified that they do make requests for copies of their trust fund statements or inquire about the status of a previously submitted grievance.

Quick also testified that she specifically spoke to Daniels while he was housed in restrictive housing. Daniels testified that he never spoke to any counselor and did not speak to Quick, but his cumulative counseling summary refutes his testimony (Doc. 126-

2). His cumulative counseling summary notes that on March 29, 2023, shortly after arriving in restrictive housing, Quick spoke with Daniels on tour (Doc. 126-2). Daniels asked whether he was being held under investigative status, and Quick informed him that he had a disciplinary report that was scheduled for hearing (*Id*.). The counseling summary also indicates that Quick spoke to Daniels on nine other occasions from April to June 2023 (*Id*.). On June 14, 2023, casework supervisor Krista Allsup also met with Daniels and informed him that he would be assigned a new counselor (*Id*.). Allsup informed Daniels that he could write her if he had any concerns until the new counselor started her tour. Daniels indicated that he had no requests (*Id*.). The counseling summary clearly refutes Daniels's testimony that he never spoke with anyone while in restrictive housing.

Daniels also argued at the hearing that Quick was not assigned his gallery during the relevant time period and that the counseling summary had been altered. He noted that he had access to his cumulative counseling summary and could prove the document presented by defendants was altered. In his July 25 notice (Doc. 124), Daniels indicated that he had proof Quick was a counselor in another gallery and that she never spoke to him while he was housed on 5 Gallery. Daniels alleged that he submitted a page from the inmate handbook, dated February 2023, which showed that Quick was the counselor in 4 Gallery (*Id*. at p. 2). He also alleged that he submitted his entire counseling summary. The documents were allegedly part of a supplement submitted on July 17, 2024, but the Court never received that filing.

Daniels fails to offer any proof of those documents or his earlier submission, nor does Daniels offer any evidence to corroborate his claims that the submission was stolen. As the docket clearly demonstrates, Daniels is a frequent filer, filing numerous "notices" and motions. One of those notices, which Daniels states he submitted on July 5, 2024, was received by the Court on July 10, 2024 (Doc. 121). Daniels's "very important notice" was dated July 22, 2024, and the Court received the notice three days later (Doc. 124). The Court further received a subsequent supplement from Daniels (Doc. 127). There is simply no evidence to suggest that Daniels submitted another notice, allegedly containing all of the evidence that would support his claim that he exhausted his administrative remedies, and that notice was then lost or stolen. Given the number of filings that have been received from Daniels, a single filing now being stolen by defendants is simply not plausible. Daniels's story is, quite frankly, extraordinary.

The more logical explanation is that there were no additional documents submitted by Daniels. Daniels clearly has a history of trying to commit fraud upon the court. He was recently found to have falsified a document in another of his cases. And there is no evidence to support his arguments. All that Daniels offers is his own speculation that his documents were stolen. And all he offers in support of his claim that Quick falsified documents and testimony is his belief that a counselor would not visit inmates who are naked and "covered in feces" (Doc. 127, p. 2). Daniels also argues that it is only common sense that the defendants would deny him the grievance process in order to cover up their misdeeds, but the evidence and testimony in the record do not support his contentions. There is evidence that Quick spoke to Daniels, and he never indicated

that he filed any grievances or inquired about their status. Nor did Daniels tell Quick that he was being denied access to the grievance process. Further, Warden Wills acknowledged that he spoke to Daniels about his placement in restrictive housing but never received a grievance about his conditions. The most logical conclusion is the simplest. Rather than numerous officials lying and falsifying documents in order to cover up Daniels's attempts to exhaust his claims, the simple answer is that Daniels never sought to submit grievances while he was in restrictive housing. This conclusion is also supported by all of the evidence in the record. Daniels failed to offer credible evidence to demonstrate that he was thwarted in his efforts to exhaust his administrative remedies. Thus, Daniels failed to exhaust his administrative remedies, and Defendants are entitled to summary judgment.

## CONCLUSION

For the reasons stated above, the motion for summary judgment (Doc. 89, 90) filed by Quinn Baker, Tyson Choate, Jakob Upton, Ken Modglin, and Anthony Wills is **GRANTED**. Daniels's claims are **DISMISSED without prejudice** for his failure to exhaust his administrative remedies. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

**DATED:  August 20, 2024**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**